RACE v. KRUM.

(Supreme Court, Appellate Division, Third Department. March 4, 1914.)

Appeal from Trial Term, Albany County.

Action by C. Bertrand Race against Charles B. Krum. From a judgment for plaintiff, and an order denying his motion for a new trial, defendant appeals. Affirmed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Joseph A. Lawson, of Albany, and Walter Jeffreys Carlin, of New York City, for appellant.

Edgar T. Brackett and Harold H. Corbin, both of Saratoga Springs, for respondent.

PER CURIAM. Judgment and order affirmed, with costs. All concur, except WOODWARD, J., dissenting in opinion, in which HOWARD, J., concurs.

WOODWARD, J. (dissenting). Originally two causes of action were alleged in the complaint, one based upon negligence, the other upon a breach of warranty; the latter being the one which was sent to the jury and upon which the verdict in favor of the plaintiff was found. The cause of action surviving is based upon a complaint which alleges upon information and belief:

That at "all the times hereinafter mentioned the defendant was the proprietor, engaged in the business of carrying on a drug store," and that the defendant, "as a part of his said business, had in his said drug store a counter at which he drew and sold soda waters and sold ice cream to be and which was largely consumed at said counter in said store, and which were sold by the defendant as fit and proper for human consumption; that on the 22d day of June, 1911, the plaintiff went to said store and, at said counter therein, ordered, from an employé of the defendant in charge of said counter, ice cream which the defendant and said defendant's employé well knew was to be eaten by the plaintiff at once and upon said premises; that said ice cream was taken from a receptacle within, or near, said counter, and by said employé of the defendant, and was handed to and served to the plaintiff, who thereupon at once, at said counter, in said store, in the presence of the employé of the defendant serving the same, ate said cream; that said ice cream thus served and delivered by said employé of the defendant was not wholesome or fit for human consumption, but on the contrary was poisonous, filled with poisonous ptomaines, and was highly injurious and poisonous to any one eating the same, which fact was known to the defendant, or should have been known by him, in the conduct of his said business."

The complaint then alleges in detail the sufferings of the plaintiff, due, as he alleges, to the eating of the ice cream, the expense to which he has been put in dealing with his illness, and continues:

"That when the defendant sold said cream hereinbefore mentioned to the plaintiff, he warranted and represented that the same was wholesome and fit and proper for human consumption, and the plaintiff relied upon such warranty and accepted and ate it as aforesaid in reliance on such warranty, and the plaintiff had no knowledge that said cream was not wholesome and suitable for him to eat; that said warranty of the defendant was broken as hereinbefore set out and the plaintiff has suffered great damage thereby."

The answer to this cause of action admits the allegations in relation to the defendant's doing business; denies knowledge or information as to the alleged purchase by the plaintiff, and the results thereof; denies the allegations in reference to the alleged unwholesomeness of the ice cream, and of its being poisonous; denies the illness of the plaintiff and the expenses incurred by him; and admits the warranty alleged as to the wholesomeness of the ice cream; but denies that the warranty was broken. The only issues presented by the pleadings, therefore, are such as relate to the alleged unwholesomeness of the ice cream, and whether the plaintiff actually purchased the same, and the results to him of partaking thereof, with his expense growing out of the illness which he claims resulted therefrom. The very interesting question of how far the purveyor of ice cream impliedly warrants the product to be free from poisons which can be detected only by bacteriological and chemical analysis, if at all, is not presented by this record,

for the answer admits a general warranty as broad as that alleged in the complaint, and rests upon a denial of the breach of such warranty, Whether, under a proper pleading, this court would be willing to hold that a person selling ice cream impliedly warranted the same to be free from poisonous ptomaines which could not be detected in the practical conduct of the business, and which no reasonable care could exclude, is purely academic here, for the defendant has consented by his pleadings to stand upon the broad proposition that he did warrant the quality in the same degree that the plaintiff has alleged, and that he has been guilty of no breach of that warranty, and the case must be determined upon the pleadings as they are now before this court.

It is entirely evident from the remarks of the learned court in denying a motion for a new trial that the court was not satisfied with the justice of the determination, that it was not convinced that the evidence warranted the conclusion reached by the jury, and we will examine the case with a view to determining whether the verdict is supported by the evidence, for this is the one question which appears to demand consideration at this time. The plaintiff, who is an attorney at law, 32 years old, testified to the effect that on the 22d day of June, 1911, he ate supper at a restaurant at about 5 o'clock in the evening; that his supper consisted of a small steak, fried potatoes, bread and butter, and tea without milk or sugar; that subsequently he walked about the city, and at about 8 o'clock in the evening met some young ladies by appointment; that at about half past 10 or 11 o'clock in the evening of that same day he, with the young ladies, went into the defendant's store; that he there ordered ice cream with fresh strawberries, as distinguished from canned strawberries, poured over the same; that he ate about half a dish of the ice cream and put it aside, afterward walking home with the ladies; that after traversing a few blocks he was taken with pains in his abdominal region; and that it became necessary for the ladies to help him to walk, though both of the ladies deny this when called in his behalf, though one of them says that he complained of nausea when he had reached her home. Plaintiff further testified that on reaching home he was taken with fits of vomiting and purging, and that the matter thrown up was of a creamy appearance, streaked with red, and that the vomiting and purging continued until both were of a watery nature. The plaintiff gave his experiences in detail, and testified that the day was the hottest ever known in Albany, or words to that effect, while the report of the weather bureau showed that the temperature did not get above 73 degrees at any time during the 22d day of June, 1911, and that it was below 70 during the evening, so that his testimony is to be taken with some degree of allowance.

With the testimony of the plaintiff as a foundation, we will examine the evidence of his doctors, and see how much of substantial fact was before the jury in support of the theory that the plaintiff was poisoned by something in the ice cream. The general contention of the plaintiff was that he was a victim of ptomaine poisoning; that this poison was in the ice cream, rather than in the meat which he had eaten at an earlier hour in the evening, and it appearing that ptomaine

poison is to be found in meats and fish, equally with milk and its products, there was an effort to further classify the poison as tyrotoxicon, which is claimed to belong to the general class of ptomaines, but to be found exclusively in milk and its products. It was conceded by all of the physicians, both for and against the plaintiff, that this tyrotoxicon is a rare and difficult poison to discover, that it is impossible to discover without a bacteriological and chemical analysis, and one of the witnesses testified that, following the exact formula of the discoverer of this elusive poison, he had been unable to isolate the poison, and the plaintiff in this action is called upon to establish, by a fair preponderance of evidence, that he was injured by reason of a poison contained in the ice cream which he purchased of the defendant under the warranty alleged.

Eddy S. Haswell, a practicing physician, was called to prescribe for the plaintiff at the time of his illness, and this witness testified that he first saw the plaintiff on the morning of June 23, 1911, at about 7:30, which was long after the plaintiff had undergone his vomiting and purging of the night. The witness says that he found plaintiff in bed with "his face somewhat flushed, his temperature 103⅘, a pulse of 120; his pulse was weak and barely perceptible to the finger at the wrist." This witness testified that the normal temperature was 98⅖, and that the normal pulse was from 70 to 80, showing a dangerous degree of increase in both, and he then describes the treatment, which is not shown to be different from that which would have been used in treating ptomaine poisoning generally. He says that the plaintiff stooled while he was present, and that the stool resembled oat straw cut into short bits and water soaked, but he made no chemical or bacteriological examination of the matter to determine whether it contained poison, and he says that he diagnosed the case from its history, from the facts stated to him by Mr. Race, the plaintiff, as being "probably some form of food poisoning and, in the common sense used in the form, that is the popular use of the word ptomaine, not technical; so I diagnosed it as a case of ptomaine poisoning." The witness then follows the case for two weeks, during which time the plaintiff gradually recovered under the treatment, and then describes a rash which developed upon one side of plaintiff's face, which spread to the eye, and which is claimed to have resulted in a permanent injury to the eye. This rash appears to have been of the nature of the disease popularly known as shingles, and its relation to the alleged poisoning seems very remote, although there is an effort to trace this to the poison. There is also some evidence on the part of this witness that he discovered a hernia, which is supposed to have been developed through the strain of vomiting and purging incident to the poisoning, and the witness then testifies that his final diagnosis of the case, as he viewed it upon the stand, was that it was "a form of food poisoning commonly expressed, the common use of the word ptomaine, not its scientific use."

Up to this time there is not a particle of evidence of anything more than a diagnosis of an ordinary case of ptomaine poisoning, such as might have resulted as well from the meat eaten at 5 o'clock as from

the ice cream eaten at 10:30 or 11 o'clock in the evening, and the witness is called upon to introduce James F. Rooney, a practicing physician of Albany, who was called and consulted by telephone. Upon cross-examination Dr. Haswell admitted that the symptoms detailed by himself might have been caused by what is popularly known as an overloaded stomach—by indigestion—and that the principal symptoms at least were identical with various diseases. He stated, in answer to a further question, that ptomaines exhibited their symptoms in the patient in from 30 minutes up to 8 or 9 hours, but admitted that he knew of no case, and that he had read no authority holding that the symptoms would develop in any case in 30 minutes, and finally said that it was conceded that the usual length of time was from 2 to 6 hours; that this was the average case. He also said the ptomaines were found in a large variety of foods, and practically admitted that they were found in meats, and, while reluctantly admitting that their presence could not be determined without an analysis, he insisted that the duty of a doctor was to at once address himself to relieving the symptoms without waiting to inquire too minutely into the cause of the symptoms, and then, conceding that he could not make an absolutely accurate diagnosis of a case of ptomaine poisoning without a laboratory examination, he said that he had made none in the case of the plaintiff, and that the only opportunity he had of getting materials for such an examination was on the occasion of his first visit, when the stool was already contaminated by the water in the closet. This is the substance of the testimony of the plaintiff's doctor, in so far as it related to the question of the presence of ptomaine poison, and it is clear that it is just as likely that the poisoning resulted from the eating of meat at 5 o'clock as from the eating of ice cream at 11 o'clock, for not a single fact is clearly stated which is not just as consistent with the one theory as the other. Concededly the poison is to be found in meat as well as in milk and its products, and the time within which it develops symptoms is as clearly within the facts in reference to the eating of the meat as in the eating of the ice cream. No one has pretended that he has found any ptomaine poison either in the matter exuded from the plaintiff or in the can from which the ice cream was served, and the symptoms which are described are concededly those which would be common to any case of ptomaine poisoning whether arising from the eating of meat or the consuming of a milk product.

We come then to the testimony of James F. Rooney, a practicing physician of Albany, who says that he did not see the plaintiff at the time of his alleged poisoning; that he merely talked with Dr. Haswell over the telephone, and advised as to the treatment. This witness was asked a hypothetical question, based on the testimony of the plaintiff and his physician, as to what plaintiff suffered from, and answered:

"I will say that the individual in question suffered from a form of food poisoning, probably tyrotoxicon; and that his herpes (rash) was the result of a nervous lesion of one of the facial nerves that has not infrequently supervened upon this form of poisoning, and that his cornea also was a direct sequence of his facial herpes."

The witness was then asked for his judgment, "on the facts assumed, as the question was finally corrected and settled, did he take such tyro-

toxicon into his system?" He answered: "I should say within an hour or two hours of the time of the first appearance of symptoms." He also declared that he would not say that so long a time as five or six hours elapsed prior to the time; that is, that he took it into his system with the supper which was stated, and then the question was reformed, and it, together with the answer, is given as follows:

"In your judgment was the tyrotoxicon taken into his system when he ate the cream and strawberries a few moments before the sickness supervened, or the steak, potatoes, bread and butter, and tea that he ate five or six hours before? A. I should say certainly with the cream which he is said to have taken, inasmuch as tyrotoxicon is only found in milk and its products."

That is, the witness testifies first that the patient "suffered from a form of food poisoning, probably tyrotoxicon," and then reaches the conclusion that he must have taken this into his system from eating the cream, and not because of any facts appearing in the hypothetical question, but because "tyrotoxicon is only found in milk and its products." There is absolutely no evidence in the case that the plaintiff suffered from tyrotoxicon poisoning, except the symptoms related by the plaintiff and his physician, and which are not shown to belong exclusively to any particular form of food poisoning, and the witness in answer to the hypothetical question does not state that he was suffering from this exclusive form of poison, but that it was "probably tyrotoxicon," and then reasons from this premise that the poisoning must have resulted from the eating of the cream, because it is only in milk products that this peculiar poison is found, which is clearly a very unsubstantial foundation for that burden of proof which the plaintiff assumed in entering upon the trial of this action. Not a single fact is pointed out to differentiate tyrotoxicon poisoning from the poisoning which results from decomposing beef, and the weakness of the evidence is clearly revealed in the question and answer immediately following. The witness was asked, "What is tyrotoxicon?" and the answer made was that it is "a poison of uncertain chemical constitution that was first isolated by Vaughan, of Ann Arbor, Mich." All the doctors, as heretofore pointed out, agree that it is a very rare and difficult poison to locate; but this witness, upon a mere statement of general symptoms, jumps to the conclusion that here is probably a case of tyrotoxicon, and upon this bridge of probabilities walks to the conclusion that the plaintiff must have taken on the poison with the cream because this peculiar brand of poison could not come from meat. But even here he does not come up to the requirements, for, while he tells us that the poison must have been taken in with the cream "inasmuch as tyrotoxicon is only found in milk and its products," he answers a further question, "It comes exclusively, do I understand you to say, from milk products?" by declaring simply that, "Milk and its products are the only things in which it has thus far been found."

That is a long way from evidence that it is not to be found in meats, in potatoes fried in lard, in bread and butter, or in tea; it is simply a statement that a rare and difficult poison to isolate has not yet been found in any other than in milk products, and, for all that we know, it may be found in any of the things which the plaintiff ate at 5 o'clock

in the afternoon. But the witness is not willing· to stand squarely upon his probability, for, after giving his theory of the manner in which tyrotoxicon works in the system, he is asked this question:

"Upon the cross-examination of a medical witness here the questions were put to him as to whether some of the symptoms exhibited by the patient were not those of gastric ulcer, acute appendicitis, typhoid fever, shingles. Now sufficient time having elapsed to demonstrate by the recovery of the patient that he did not have any of these diseases which I have named as being mentioned on the cross-examination, does not that accentuate and confirm your diagnosis of tyrotoxicon poisoning?"

And the witness answered:

"Why, it confirms the diagnosis of food poisoning absolutely."

The examination was continued farther, but the witness did not go beyond the point of claiming that the diagnosis of food poisoning was confirmed by the later developments in the plaintiff's case, so that with the exception of the intrusion of the probability of tyrotoxicon there is absolutely no evidence in the case which tends to show anything more than that the plaintiff was poisoned by some kind of a food poison, commonly known as ptomaine poison, and the conclusion of the witness that this poison must have been taken in with the ice cream is the ·merest guesswork, and has no foundation better than exists for the conclusion that the poison was taken into the system with the beefsteak eaten at 5 o'clock, and this is the gist of all of the evidence produced on the part of the plaintiff to show that he was poisoned by eating ice cream at the defendant's store on the 22d day of June, 1911.

Assuming, without deciding, that there was in this testimony enough of evidence to take the case to the jury, the whole of the force of the evidence was negatived by the defendant's witnesses, all of whom appear to be far better qualified to testify upon the question at issue, for they are men who have specially qualified along these lines. Harry Saul Bernstein, who qualified as an expert in bacteriological matters, and who is the secretary of the milk commission of the county of Albany, and has had a wide experience in dealing with the examination of milk, testified in behalf of the defendant, and after describing the process of discovering food poisons in individuals, and telling us that the diagnosis of ptomaine poisoning can only be done with certainty by an examination of the vomitus and the stool of the patient, he explains about tyrotoxicon and says that it "is an exceedingly rare poison produced in milk and milk products and produced only under ·unhealthy conditions." A few excerpts from his direct testimony, in no manner weakened by cross-examination, will be of interest at this point. We give the matter as it appears in the record:

"In the case of poisoning arising from the presence of tyrotoxicon in the human system, what would you say with regard to the temperature as to being high or low, normal or subnormal? A. The temperature, according to the cases reported, has been subnormal with one exception. Q. What do you mean by subnormal? A. Below the normal. The normal is 98.6, and a temperature anything below that is subnormal. Q. And one of the symptoms of tyrotoxicon poisoning is the subnormal temperature? A. That is so regarded. Q. When do the symptoms of tyrotoxicon poisoning first begin to show themselves after the food in which the tyrotoxicon exists has been taken into the system, how long after? A. From one to ten hours. * * * Q. Will you kindly

tell the jury whether nausea, vomiting, purging, and tenderness of the abdomen are symptoms of any kind of food poisoning? A. Those symptoms occur in poisoning with meat, in poisoning with fish. They may also occur in any number of diseases. * * * Q. Assuming that a man of about 30 years of age, of a good physique, born and reared in the country, on the 22d of June, 1911, with a temperature ranging from 56 to 73 in the 24 hours, at 5 o'clock in the afternoon partook of a meal consisting of a small beefsteak, potatoes fried in lard, bread and butter, tea without either milk or sugar, and from five to six hours afterwards ate half a dish of ice cream with fresh strawberries and the juice thereof poured over it, and immediately after eating the ice cream, or so immediately after as to be but a few minutes, was taken with nausea, and within 45 minutes with violent vomiting and severe pains in the abdomen, and diarrhœa, would in your opinion those symptoms be caused by food poisoning in a meal partaken at 5 o'clock, or in the ice cream consumed five or six hours later? A. Those symptoms would arise from the meal partaken at 5 o'clock, or prior to that. Q. And what would you say would be the character of the poison that produced those symptoms, the ptomaine, the tyrotoxicon—I use ptomaine in the popular sense, I know you have given tyrotoxicon as a subdivision of ptomaine—but would it in your opinion be a result of tyrotoxicon poisoning? A. No, it would not be the result of tyrotoxicon poisoning. Q. But would be the result of what kind of poison in your opinion, some kind of food poison? A. It would be the result of some kind of food poison; it is difficult to state what kind. Q. Could it be determined without analysis, bacteriological and chemical, in your opinion? A. It could not be."

This witness testified that ice cream manufactured and served in the manner testified to by the defendant and his witnesses would not probably take on tyrotoxicon poison; that it would be almost impossible. An elaborate cross-examination did not weaken this testimony in any degree, and being asked the question, "Are the symptoms that attach to poison from eating a steak the same as those that attach to taking tyrotoxicon," the witness answered: "The symptoms are almost identical. The only difference comes on in the intensity of the symptoms."

Ralph E. Myers, who qualified as a physiological chemist, testified that "we can say, generaly speaking, that ptomaine poisons from meat, from ice cream, from cheese, and perhaps some other things, would give about the same train of symptoms," and that meats were more likely to contain ptomaines than milk, and generally his testimony was in harmony with that of the preceding witness, and it stood the test of cross-examination equally well. He was followed by Andrew MacFarlane, M. D., whose qualifications were conceded by the plaintiff, and who, in addition to his general practice, had specialized upon bacteriology and chemistry. Dr. MacFarlane testified that meat containing poisonous ptomaines when taken into the stomach began to show effects in from 5 to 6 hours and for indefinite times up to 24 or 36 hours, so that it appears, from undisputed testimony of a competent authority, that the poison which the plaintiff took into his system might have been there not only from the time of taking the meal at 5 o'clock, but for a day or more previous to the time that the symptoms developed, and the same witness, answering a question based on the symptoms narrated by the witnesses, says that:

"All of those symptoms could not be produced by tyrotoxicon poisoning of the ice cream which he took directly before the symptoms appeared."

And later he declared positively that they could not be produced by the ice cream.

It would be tedious and unprofitable to follow these witnesses in detail, but enough has been pointed out to show that opposed to the testimony of one physician, who bases his conclusion upon his assumption that the plaintiff was poisoned by tyrotoxicon, is the testimony of three men fully qualified to speak, and they concur in the essential matters involved in the case, and they are entirely uncontradicted in the most essential points. Giving the plaintiff the benefit of the assumption that there was evidence entitling him to go to the jury at the close of his case, we are fully persuaded that the verdict is not supported by the weight of evidence, and that it ought not to stand. The evidence is far stronger that the plaintiff took the poison into his system at his evening meal than that he was wronged by the defendant in selling him a dish of ice cream, and the burden was upon the plaintiff to establish that he received the poison from the defendant, and not from any other source. This he has clearly failed to do. The only affirmative evidence is that furnished by the plaintiff that he ate the ice cream, and by his physician that certain symptoms developed. But the plaintiff also testified that he ate beefsteak at 5 o'clock in the afternoon, and the overwhelming weight of evidence is that meat is equally liable to produce the exact symptoms detailed by the plaintiff and his witnesses, and within the time which had elapsed between the taking of the food and the occurrence of the symptoms. Besides this, the evidence is undisputed that the symptoms from ptomaine poisoning might develop at any time within 36 hours of the taking in of food, and that the question of what kind of poisoning resulted could not be determined without an analysis, based upon actual examination of the excretions. In other words, we are asked to hold that a mere diagnosis of a comparatively unknown physician is to take the place of evidence, and that the defendant is to be charged with responsibility for the plaintiff's misfortunes without a particle of evidence to show that he was in any manner liable for the presence of poison in the plaintiff's stomach and bowels. We might, with the jury, guess that he took in the poison with the ice cream; but it would be merely a guess, unsupported by any tangible evidence, and contrary to the weight of evidence appearing in the record.

The judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the event.